IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE JJ DOE,<br><br>Plaintiff,<br><br>*v.*<br><br>APPLE INC.,<br><br>Defendant. | Case No. ____________ |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. Plaintiff Jane JJ Doe ("Plaintiff") brings this action against Defendant Apple Inc. ("Apple" or "Defendant") for injuries arising from Apple's design, manufacture, marketing, and sale of the Apple AirTag® ("AirTag"), a consumer tracking device that Apple knew would be—and has been—widely used as a stalking tool. Apple released the AirTag in April 2021 knowing full well that its anti-stalking safeguards were inadequate to prevent the foreseeable use of the product for covert, nonconsensual location tracking.

2. Despite receiving over 40,000 stalking reports and repeated warnings from law enforcement agencies, domestic violence advocacy organizations, and the media, Apple has failed to implement adequate safeguards to protect victims of AirTag-facilitated stalking. Apple's piecemeal, reactive approach to safety has consistently prioritized product sales and market positioning over human safety.

3. As a direct and foreseeable result of Apple's failures, Plaintiff was stalked by her former romantic partner (the "Stalker") using concealed Apple AirTags placed in her home and on her vehicle. Plaintiff uses an Android phone and did not have Tracker Detect or any similar application installed. Although Plaintiff and her children occasionally received Apple notifications, the Stalker kept replacing AirTags as soon as they were discovered, rendering Apple's detection features ineffective.

4. Plaintiff's Stalker used the AirTags to continuously track her location, follow her to her clients' homes, break into her residence on multiple occasions, physically assault her, destroy her property, and terrorize her and her family. Despite seventeen pending criminal charges against the Stalker, and six protection order violations, the stalking facilitated by Apple's AirTags continued unabated.

5. Plaintiff seeks compensatory damages, statutory damages, injunctive relief, attorney fees, costs, and all other relief to which she is entitled.

## PARTIES

6. Plaintiff Jane JJ Doe ("Plaintiff") is a natural person and citizen of the State of Nebraska, residing in Lincoln, Nebraska.

7. Defendant Apple Inc. ("Apple" or "Defendant") is a corporation organized under the laws of the State of California, with its principal place of business at One Apple Park Way, Cupertino, California 95014. Apple is an American multinational technology company that designs, manufactures, markets, distributes, and sells consumer electronics, including the Apple AirTag. Apple is a citizen of the State of California for purposes of 28 U.S.C. § 1332(c)(1). Apple generally oversees all aspects of the AirTag, including but not limited to its design, manufacture, marketing, distribution, technical support, and maintenance.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because this is a civil action between citizens of different states—Plaintiff is a citizen of the State of Nebraska and Defendant is a citizen of the State of California—and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. This Court has personal jurisdiction over Defendant Apple Inc. because Apple conducts substantial and continuous business in the State of Nebraska, including selling and distributing AirTags to Nebraska consumers through its retail stores, authorized resellers, and online channels. Apple has derived substantial revenue from its Nebraska operations and has sufficient minimum contacts with Nebraska to support the exercise of personal jurisdiction consistent with due process.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Lincoln, Lancaster County, Nebraska, which is within the District of Nebraska.

## GENERAL ALLEGATIONS

***The AirTag and Its Known Dangers***

11. In April 2021, Apple released the AirTag, a small, standalone Bluetooth tracking device roughly the size of a United States quarter. The AirTag is marketed to help consumers locate personal items such as keys, wallets, and bags. It retails for approximately $29.00 per unit.

12. The AirTag uses Bluetooth Low Energy ("BLE") technology to communicate its location. It works by broadcasting a rotating identifier that is detected by nearby Apple devices, which then relay the AirTag's location to Apple's servers through the "Find My" network. The

Find My network leverages over two billion active Apple devices worldwide to function as a massive mesh tracking network.

13. This means that an AirTag's location can be updated virtually anywhere in the world where Apple devices are present—which is to say, virtually everywhere. The network operates silently, without the knowledge or consent of the Apple device owners who serve as intermediary relay points.

14. Prior to the AirTag's release, numerous commentators, journalists, domestic violence advocates, and technology experts publicly warned that small, inexpensive Bluetooth trackers would inevitably be used as stalking tools. Apple was well aware of these concerns.

15. Internal Apple communications confirm that the company anticipated use of the AirTag for purposes of unwanted tracking. Apple's own marketing materials acknowledged the risk. Apple described the AirTag's anti-stalking features as designed to "deter as opposed to prevent" malicious use—a candid admission that the product was knowingly released with inadequate safeguards.

16. Despite knowing the risks, Apple chose to release the AirTag in April 2021 with only minimal anti-stalking safeguards, including: (a) an audible alert that would sound only after three days of separation from its owner's iPhone; and (b) a notification system that would alert iPhone users—but not Android users—to the presence of an unknown AirTag traveling with them.

17. These measures were woefully inadequate. Three days without an alert gives a stalker more than enough time to track a victim's patterns, home address, workplace, and daily routine. Moreover, approximately half of all smartphone users in the United States use Android devices. At launch, these users had absolutely no way to detect an AirTag being used to track them.

18. Apple made a calculated business decision to release the AirTag despite knowing it was inadequately protected against stalking. Apple prioritized market timing and commercial gain over human safety.

***The Predictable Consequences***

19. Almost immediately after the AirTag's release in April 2021, reports of AirTag-facilitated stalking began flooding in from individuals who had been stalked, tracked, and terrorized through the use of AirTags. AirTags have been placed in wheel wells of cars, in purses, in jacket pockets, and in children's backpacks.

20. AirTags have facilitated stalking in domestic violence situations, enabling abusers to locate victims who have fled for their safety. Multiple murders have occurred in which the perpetrator used an AirTag to track the victim prior to the killing.

21. From April 2021 through April 2024, Apple received over 40,000 stalking reports related to AirTags, averaging over 1,000 complaints per month. Apple also knew that the vast majority of law enforcement complaints it received concerning AirTags involved stalking—nearly twenty times as many as any other category of crime. Apple's public characterization of stalking incidents as "rare" was deliberately misleading.

***Apple's Inadequate Response***

22. In February 2022, Apple announced that it would reduce the time before an unknown AirTag would emit a sound from three days to a random interval between 8 and 24 hours. Even this reduced interval provides a stalker with ample time to determine a victim's home address, workplace, and routine.

23. In December 2021—eight months after the AirTag's release—Apple released a "Tracker Detect" app for Android devices. The app was widely criticized as inadequate because it

required manual scanning; users had to affirmatively open the app and initiate a scan to detect nearby AirTags. Unlike the automatic background detection available to iPhone users, Android users had to suspect they were being tracked in order to think to scan for trackers—a Catch-22 that rendered the app functionally useless for most victims.

24. The AirTag's speaker—meant to emit a sound to alert a victim to an unknown AirTag's presence—was small and produced a sound easily drowned out by ambient noise, particularly when the AirTag was hidden in a vehicle's wheel well or undercarriage. Moreover, instructions for disabling the AirTag's speaker were widely available online, and the AirTag remained functional even after its speaker was disabled.

25. Apple's incremental, piecemeal approach to safety—implementing half-measures only after public outcry—demonstrates that Apple has consistently prioritized product sales over consumer safety.

***Feasible Alternative Designs***

26. At all times relevant to this Complaint, alternative feasible designs existed that would have substantially reduced or eliminated the risk of AirTag-facilitated stalking without impairing the product's legitimate tracking functionality. These alternatives include but are not limited to:

(a) **Identity Verification:** Apple could have required identity verification or account linking before activating an AirTag, creating accountability for stalking and deterring anonymous stalking.

(b) **Tamper-Resistant Speakers:** Apple could have designed the AirTag with a louder, non-removable speaker that would sound immediately or within minutes—rather

than hours or days—when separated from its owner, and that would render the AirTag non-functional if the speaker were disabled or removed.

(c) **Immediate Alerts:** Apple could have implemented immediate or near-immediate alerts to both iPhone and Android users when an unknown AirTag is detected traveling with them.

(d) **Geofencing:** Apple could have implemented geofencing features that would automatically disable an AirTag's tracking when it remained in proximity to a non-owner's device for a defined period.

(e) **Mandatory Re-Authentication:** Apple could have designed the AirTag to require periodic re-authentication by the owner, preventing indefinite passive tracking.

(f) **Rate-Limiting Features:** Apple could have implemented rate-limiting features preventing a single user from deploying multiple AirTags in close proximity to a non-owner's device.

(g) **Registration Systems:** Apple could have implemented a mandatory registration system linking each AirTag to a verified identity, enabling law enforcement to quickly identify stalkers.

(h) **Cross-Platform Parity:** Apple could have released simultaneous and equivalent detection tools for Android users at the time of the AirTag's launch, rather than leaving half the population unprotected for years.

27. Each of these alternative designs was technologically feasible at the time of the AirTag's release in April 2021. Apple possessed the engineering resources and technical capability to implement them. Apple chose not to do so.

***Apple's Knowledge and Corporate Conduct***

28. Only weeks after the AirTag's release, Apple CEO Tim Cook was briefed on press reports describing the AirTag as "a new means of inexpensive, effective stalking." Cook was advised that Apple could weather the storm: "At this time, we are not seeing this narrative gain steam in media or on social…." Rather than address the safety concerns raised in the press, Apple focused on managing the media narrative.

29. While Apple publicly claimed that AirTag-related stalking incidents were "rare," Apple's internal data showed that it received over 40,000 unwanted tracking reports during the initial three-year period following the AirTag's release, ending in April 2024. Apple also knew that the vast majority of law enforcement complaints it received concerned stalking—nearly twenty times as many policy inquiries as any other crime. Apple's characterization of stalking incidents as "rare" was deliberately misleading.

30. Apple has failed to provide meaningful support to victims of AirTag stalking. Apple routinely refuses to cooperate with victims seeking help prosecuting or obtaining restraining orders against their stalkers, regularly deletes pairing information associating stalkers with the AirTags they used, and gives victims only weeks to seek that information before it is destroyed. Apple's own legal-process guidelines confirm that AirTag pairing history is available for a period of only up to 25 days.

31. Apple has generated billions of dollars in revenue from AirTag sales and the broader Find My ecosystem while externalizing the costs of its product's use onto victims, law enforcement, and society at large. The low cost and wide availability of AirTags has democratized stalking, making it accessible to virtually anyone with $29 and an iPhone.

32. The harms caused by Apple's AirTag are ongoing. As of the date of this filing, Apple continues to sell AirTags with safeguards that remain inadequate to protect consumers and the public from unwanted tracking.

## FACTUAL BACKGROUND — PLAINTIFF'S EXPERIENCE

33. Plaintiff resides in Lancaster County, Nebraska. The stalking and related events described herein occurred in Lincoln, Nebraska.

34. Plaintiff's Stalker is a former romantic partner. Plaintiff dated the Stalker approximately eighteen years ago for a period of approximately one and a half years. The relationship was marked by domestic abuse. The parties separated and had no contact for approximately eleven years, until approximately 2019, when the Stalker re-initiated contact with Plaintiff.

35. Beginning on or about January 1, 2024, and continuing through the present, the Stalker engaged in a relentless campaign of stalking, harassment, intimidation, physical violence, and property destruction against Plaintiff, facilitated by Apple AirTags.

36. Plaintiff first discovered an Apple AirTag on her refrigerator at her home in Lincoln, Nebraska. She initially mistook the device for a magnet. Upon closer inspection the following morning, she recognized it as an Apple AirTag. When confronted, the Stalker admitted to placing the AirTag on Plaintiff's refrigerator.

37. Following the discovery of the first AirTag, Plaintiff discovered multiple additional Apple AirTags concealed in her car on various occasions. Each time Plaintiff found and removed an AirTag, the Stalker would replace it with a new one, creating an ongoing cycle of covert surveillance that Apple's detection features were powerless to prevent.

38. Plaintiff uses an Android phone. She did not have Tracker Detect or any similar application installed on her device. Although Plaintiff did receive some Apple notifications alerting her to the presence of an AirTag, and her children or their friends also received notifications on their phones when riding in her car, the Stalker's practice of continuously replacing AirTags rendered these sporadic notifications ineffective as a protective measure.

39. The Stalker used the AirTags to track Plaintiff's location continuously. He followed Plaintiff everywhere she went, sometimes for hours at a time. The Stalker demonstrated real-time knowledge of Plaintiff's location and movements due to AirTag surveillance.

40. Plaintiff owns a landscaping company with several wealthy clients. The Stalker used the AirTags to follow Plaintiff to her clients' homes and, upon arrival, would create scenes and disturbances. As a direct result of the Stalker's conduct at her clients' properties, Plaintiff lost several significant clients, causing substantial economic harm to her livelihood and business.

41. The Stalker broke into Plaintiff's home on multiple occasions. On one occasion, Plaintiff found the Stalker hiding in her daughter's bedroom inside the home. On another occasion, the Stalker concealed himself under the staircase inside Plaintiff's home and grabbed Plaintiff's foot as she walked up the stairs.

42. The Stalker was captured on Plaintiff's Ring surveillance cameras and other security cameras appearing outside her home wearing various wigs and disguises in an effort to evade detection.

43. The Stalker physically assaulted Plaintiff on multiple occasions, resulting in hospitalizations. The Stalker also slashed Plaintiff's tires and broke her windows as part of his ongoing campaign of harassment and intimidation.

44. Plaintiff reported the stalking to the Lincoln Police Department ("LPD") in June 2024. Plaintiff has obtained six protection orders and stalking charges against the Stalker. Despite these protective measures, each time the Stalker violated a protection order, he would stay in jail for only a few days before returning to Plaintiff's home. There have been seventeen pending criminal charges against the Stalker and six documented violations of protection orders.

45. Plaintiff turned over all AirTags and tracking devices to the LPD. Police determined that the AirTags were registered to the Stalker.

46. Because Plaintiff no longer felt safe in her own home due to the Stalker's repeated break-ins—which were facilitated by the AirTag-enabled surveillance of her movements and schedule—Plaintiff purchased a $22,000 camper as alternate living quarters and parked it at a lake near Lincoln, Nebraska.

47. On August 14, 2026, Plaintiff's camper was intentionally set on fire. The camper was so newly purchased that Plaintiff had not yet obtained insurance for it. Police are still investigating the arson, but they found a match inside the camper drenched with lighter fluid, confirming that the fire was intentionally set.

48. The Stalker was responsible for the arson, consistent with his established pattern of surveilling Plaintiff's movements through AirTags and then targeting her property. The Stalker's ability to locate the camper at a remote lake near Lincoln, Nebraska, was possible due to AirTag-facilitated tracking of Plaintiff's vehicle to the camper's location.

49. As a direct and proximate consequence of the prolonged AirTag-facilitated stalking, the physical assaults, the property destruction, the home invasions, the arson, and the severe and continuous stress of being covertly surveilled and terrorized, Plaintiff has suffered significant physical, emotional, and psychological harm, including but not limited to severe

anxiety, constant fear, trauma, hypervigilance, disruption of daily life, loss of business income, destruction of property, and other economic and non-economic losses.

50. Plaintiff is traumatized. She lives in fear every day due to the stalking with trackers. Plaintiff is deathly afraid and lives in fear.

51. The AirTag's inadequate anti-stalking measures directly contributed to Plaintiff's injuries by allowing the stalking to continue undetected and unimpeded. The Stalker's ability to continuously replace AirTags with impunity—without any meaningful accountability mechanism built into the product—enabled a sustained pattern of surveillance, harassment, and violence that Apple's product facilitated.

52. Plaintiff was a foreseeable victim of the type of harm that Apple knew its product would cause. Plaintiff is precisely the type of person—a woman stalked by a former romantic partner using concealed AirTags—whom Apple's safeguards were purportedly designed to protect. Those safeguards failed Plaintiff entirely.

**<u>COUNT I</u>**

**NEGLIGENCE (NEBRASKA LAW)**

53. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

54. Apple owed Plaintiff a duty of reasonable care in the design, manufacture, marketing, and distribution of AirTags. A manufacturer has a duty to warn where the product possesses dangerous propensities and there is unequal knowledge regarding the risk of harm. *See Krajewski v. Enderes Tool Co.*, 469 F.3d 705, 708 (8th Cir. 2006) (applying Nebraska law) (explaining that a "manufacturer or other seller is subject to liability for failing either to warn or adequately to warn about a risk or hazard inherent in the way a product is designed that is related

to the intended uses as well as the reasonably foreseeable uses that may be made of the products it sells").

55. Additionally, Nebraska's stalking statutes, Neb. Rev. Stat. § 28-311.02 *et seq.*, establish a statutory standard of conduct reflecting the Legislature's determination that stalking conduct — knowing, willful conduct directed at a specific person that seriously terrifies, threatens, or intimidates — constitutes a grave harm warranting criminal sanctions. Apple's knowing facilitation of stalking conduct through the sale of a product it knew was being widely used for that purpose, with safeguards it knew were inadequate, violated the standard of care informed by these statutes. In the alternative, Apple's knowledge that its product was being used to commit stalking in violation of Nebraska law, combined with its failure to implement adequate safeguards, constitutes evidence of negligence bearing on the applicable standard of care.

56. Apple knew or should have known that AirTags would be—and were being—used as stalking tools and that its anti-stalking safeguards were inadequate to protect foreseeable victims such as Plaintiff. The foreseeability of AirTag-facilitated stalking was well-established by Apple's receipt of over 40,000 stalking reports, warnings from law enforcement agencies and domestic violence advocacy organizations, Apple's own internal data, and media reports brought to the attention of Apple's CEO shortly after the AirTag's release.

57. Apple breached its duty of care by designing, manufacturing, releasing, and continuing to sell AirTags without adequate anti-stalking safeguards, including but not limited to: effective and timely notification systems for all users, including Android users; tamper-resistant alert mechanisms; design features to prevent covert placement and continuous nonconsensual tracking; identity verification systems; and the numerous other feasible alternative safeguards described herein.

58. The question of whether Apple's conduct was reasonable must be evaluated "in view of the foreseeable risk of injury." *Krajewski*, 469 F.3d at 708. Apple's receipt of tens of thousands of stalking reports, combined with its knowledge that its product was being used as a tool of domestic violence and murder, rendered the risk of injury to persons in Plaintiff's position eminently foreseeable.

59. Apple's breach was the actual and proximate cause of Plaintiff's injuries. Under Nebraska law, a third party's criminal conduct does not constitute a superseding intervening cause where the criminal act was a foreseeable consequence of the defendant's conduct. Here, Apple's own internal data — including over 40,000 stalking reports, law enforcement complaints in which stalking outnumbered all other crime categories by a ratio of nearly twenty to one, and reports of multiple AirTag-facilitated homicides — established that criminal use of the AirTag for stalking was not merely foreseeable but virtually certain. Apple's CEO was personally advised of these risks within weeks of the AirTag's release. Apple nonetheless continued to sell AirTags with safeguards it knew were inadequate, making the Stalker's criminal conduct not a superseding cause but a natural and probable consequence of Apple's decision to place an inadequately safeguarded surveillance tool into the stream of commerce.

60. Apple's failure to implement adequate safeguards directly enabled the stalking to continue undetected and unimpeded. Plaintiff's Stalker placed concealed AirTags in Plaintiff's home and on her vehicle and tracked her on multiple occasions over an extended period. The stalking, physical assaults, property destruction, home invasions, arson, business losses, and resulting harm were the direct and foreseeable result of Apple's negligence.

61. As a direct and proximate result of Apple's negligence, Plaintiff has suffered compensable physical, emotional, and psychological injuries, property destruction, economic losses, lost business income, and other damages in amounts to be proven at trial.

62. Apple's conduct was willful, reckless, and undertaken with conscious disregard for the safety of consumers, including Plaintiff. Apple's actions — releasing and continuing to sell a product it knew was being used to stalk tens of thousands of victims while failing to implement adequate safeguards and while affirmatively misrepresenting the scope of the problem — constitute aggravating circumstances that this jury should consider in awarding compensatory damages. The nature, extent, and enormity of Apple's wrongful conduct are relevant to the full measure of Plaintiff's compensable harm.

**COUNT II**

**PRODUCT LIABILITY — DESIGN DEFECT (STRICT LIABILITY)**

**(Neb. Rev. Stat. § 25-21,180 *et seq.*)**

63. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

64. Apple designs, manufactures, distributes, and sells AirTags within the meaning of Nebraska's Product Liability Act, Neb. Rev. Stat. § 25-21,180 *et seq.*

65. Under Nebraska strict product liability law, the elements of a design defect claim are: (1) the defendant placed the product on the market for use and knew it would be used without inspection for defects; (2) the product was in a defective condition when placed on the market; (3) the defect was the proximate or proximately contributing cause of the plaintiff's injuries while the product was being used in a way and for the general purpose for which it was designed and

intended; (4) the defect rendered the product unreasonably dangerous and unsafe for its intended use; and (5) the plaintiff's damages were a direct and proximate result of the alleged defect.

66. Apple placed AirTags on the market for use and knew they would be used without inspection for defects by consumers and the general public.

67. The AirTag was in a defective condition when placed on the market. Under Nebraska law, a product is "unreasonably dangerous" when it "has a propensity for causing physical harm beyond that which would be contemplated by the ordinary user or consumer who purchases it, with the ordinary knowledge common to the foreseeable class of users as to its characteristics." *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 440 (1987).

68. The AirTag was defective in design because:

(a) Its foreseeable risks of facilitating stalking, domestic violence, and related criminal conduct outweighed its utility as a consumer item-finding device, particularly given the availability of feasible alternative designs that would have preserved the product's legitimate functionality while substantially reducing the risk of stalking;

(b) It failed to perform as safely as an ordinary consumer would expect, as it enabled covert, continuous location tracking without timely notice or meaningful ability to detect or disable the device;

(c) Practical, technologically feasible alternative designs existed at the time of the AirTag's release in April 2021 that would have significantly reduced the risk of stalking without impairing the product's legitimate tracking functionality, including identity verification, tamper-resistant speakers, immediate and reliable alerts, geofencing capabilities, mandatory re-authentication, rate-limiting features, registration systems, and equivalent cross-platform detection for all smartphone users.

69. Under *Rahmig*, Nebraska does not require proof of a feasible alternative design to recover under a design defect claim. However, evidence of feasible alternatives is relevant and persuasive. As set forth in the General Allegations, multiple feasible alternative designs existed that Apple chose not to implement.

70. The AirTag's design defect was a substantial factor in causing Plaintiff's injuries. The defect was the proximate or proximately contributing cause of Plaintiff's injuries while the AirTag was being used for the general purpose for which it was designed and intended — namely, real-time location tracking.

71. The AirTag's core function is to determine the precise geographic location of whatever object it is attached to and report that location to the registered user. The product performs this function identically regardless of whether it is placed on a set of keys, inside a handbag, or on a person's vehicle. Tracking the location of a person — whether consensually or nonconsensually — is not a deviation from the AirTag's intended purpose; it is the product's intended purpose, applied to a foreseeable subject.

72. Apple's own marketing materials acknowledged the risk of unwanted tracking and described the AirTag's anti-stalking features as designed to "deter as opposed to prevent" such use — a recognition that tracking persons was a foreseeable and inherent application of the product.

73. Plaintiff's damages—including physical, emotional, and psychological harm, property destruction, lost business income, economic losses, and other damages—were a direct and proximate result of the AirTag's defective design, in amounts to be proven at trial.

74. Apple had actual knowledge of the AirTag's dangerous propensity to facilitate stalking, yet consciously disregarded the known safety risks and continued to sell the product

without implementing feasible safeguards. Apple's conduct demonstrates a reckless and conscious disregard for a highly unreasonable risk of harm.

**COUNT III**

**PRODUCT LIABILITY — FAILURE TO WARN (STRICT LIABILITY)**

**(Neb. Rev. Stat. § 25-21,180 et seq.)**

75. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

76. This Count is brought as a claim for strict product liability based on a failure to warn, as distinguished from the design defect claim asserted in Count II.

77. Under Nebraska law, a manufacturer or other seller is subject to liability for failing either to warn or adequately to warn about a risk or hazard inherent in the way a product is designed that is related to the intended uses as well as the reasonably foreseeable uses that may be made of the products it sells.

78. A product may be defective if the manufacturer sells it without sufficient warnings or instructions. *See Davis v. Simon Contrs., Inc.*, 117 F.4th 994 (8th Cir. 2024) (applying Nebraska law) (explaining that "under Nebraska law, to recover on a theory of negligence or strict products liability based on a defective warning theory, a plaintiff must prove, among other things, that a warning defect proximately caused their injury while the product was being used as intended, and the defect, if existent, rendered the product unreasonably dangerous and unsafe for its intended use" (cleaned up)).

79. The elements of a strict product liability claim in Nebraska are: (1) the defendant placed the product on the market for use and knew, or in the exercise of reasonable care should have known, that the product would be used without inspection for defects; (2) the product was in

a defective condition when placed on the market and left the defendant's possession; (3) the defect was the proximate or a proximately contributing cause of the plaintiff's injury sustained while the product was being used in a way and for the general purpose for which it was designed and intended; (4) the defect, if existent, rendered the product unreasonably dangerous and unsafe for its intended use; and (5) the plaintiff's damages were a direct and proximate result of the alleged defect.

80. Apple placed AirTags on the market for use and knew, or in the exercise of reasonable care should have known, that AirTags would be used by consumers and the general public without inspection for defects, including without inspection for the adequacy of the product's warnings regarding foreseeable stalking risks.

81. The AirTag was in a defective condition when placed on the market because Apple failed to warn purchasers and foreseeable third-party victims of the documented and well-known risks of AirTag-facilitated stalking. Specifically, Apple failed to:

(a) Warn AirTag purchasers that the product had been and was being widely used as a stalking tool, that Apple had received over 40,000 stalking reports, and that stalking represented nearly twenty times as many law enforcement complaints as any other category of crime associated with AirTags;

(b) Warn potential victims — particularly users of Android devices who had no automatic detection capability — that an AirTag could be covertly placed on their person, in their vehicle, or in their home and used to track their real-time location without their knowledge or consent;

(c) Provide any meaningful instructions to AirTag purchasers or the general public regarding the detection and removal of AirTags being used for nonconsensual tracking,

particularly for the approximately half of all smartphone users in the United States who use Android devices;

(d) Warn consumers and the public that the AirTag's speaker could be easily disabled, that instructions for disabling the speaker were widely available online, and that the AirTag remained fully functional as a tracking device even after its speaker was removed or disabled.

82. Apple's failure to warn rendered the AirTag unreasonably dangerous. Under Nebraska law, a product is "unreasonably dangerous" when it "has a propensity for causing physical harm beyond that which would be contemplated by the ordinary user or consumer who purchases it, with the ordinary knowledge common to the foreseeable class of users as to its characteristics." *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 440 (1987). An ordinary consumer would not contemplate that a $29 consumer item-finding device could be used as an undetectable, continuous surveillance tool capable of facilitating stalking, domestic violence, and murder — risks that Apple knew existed but failed to disclose.

83. Apple's failure to warn was the proximate and a proximately contributing cause of Plaintiff's injuries. The question of whether a manufacturer's conduct is reasonable must be evaluated in view of the foreseeable risk of injury. Apple's receipt of tens of thousands of stalking reports made the risk of injury to persons in Plaintiff's position eminently foreseeable, and Apple's failure to warn of those known risks directly contributed to Plaintiff's inability to detect or protect herself from the AirTag-facilitated stalking.

84. The warning defect caused Plaintiff's injuries while the AirTag was being used in a way and for the general purpose for which it was designed and intended — namely, real-time location tracking. Adequate warnings would have enabled Plaintiff to detect the AirTags sooner,

seek assistance from law enforcement with greater urgency, and take protective measures to prevent or mitigate the prolonged stalking, physical assaults, property destruction, and other harms she suffered.

85. Plaintiff's damages — including physical, emotional, and psychological harm, property destruction, lost business income, economic losses, and other damages — were a direct and proximate result of Apple's failure to warn, in amounts to be proven at trial.

86. Apple's conduct was willful, reckless, and undertaken with conscious disregard for the safety of consumers, including Plaintiff. Apple's knowing failure to warn of a danger it had documented through over 40,000 stalking reports — while affirmatively characterizing stalking incidents as "rare" — constitutes aggravating circumstances that the jury should consider in awarding the full measure of Plaintiff's compensatory damages.

**COUNT IV**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**(NEBRASKA COMMON LAW)**

87. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

88. Under Nebraska law, a plaintiff may recover for negligent infliction of emotional distress where the plaintiff was a "direct victim" of the defendant's negligence because the plaintiff was within the zone of danger of the negligence in question; and the plaintiff suffered emotional distress that is "medically diagnosable and significant" and "so severe that no reasonable person could have been expected to endure it." *Catron v. Lewis*, 271 Neb. 416, 420-21 (2006).

89. Plaintiff was a direct victim of Apple's negligence. Plaintiff was within the zone of danger created by Apple's negligent design, manufacture, and sale of AirTags with inadequate

anti-stalking safeguards. As a foreseeable victim of AirTag-facilitated stalking — a woman stalked by a former romantic partner using concealed AirTags — Plaintiff was directly and foreseeably placed at risk of physical harm by Apple's negligence. Indeed, Plaintiff suffered actual physical harm: the Stalker physically assaulted Plaintiff on multiple occasions.

90. Apple owed Plaintiff a duty of reasonable care in the design, manufacture, marketing, and distribution of AirTags, as set forth in Count I. Apple breached that duty by failing to implement adequate anti-stalking safeguards, as set forth in the General Allegations and Count I. Apple's negligence was the actual and proximate cause of the Stalker's ability to continuously track, follow, and terrorize Plaintiff.

91. As a direct and proximate result of Apple's negligence, Plaintiff has suffered severe emotional distress that is medically diagnosable and significant, including but not limited to:

(a) Post-traumatic stress disorder (PTSD) resulting from the prolonged campaign of stalking, physical assaults, home invasions, property destruction, and arson;

(b) Severe anxiety, including chronic hypervigilance and persistent fear that the Stalker will locate and harm her or her children;

(c) Trauma, including intrusive thoughts, flashbacks, sleep disturbances, and inability to feel safe in her own home or community;

(d) Depression and disruption of daily life, including the inability to maintain normal personal and professional routines;

(e) Other medically diagnosable psychological and emotional conditions to be established through expert medical testimony at trial.

92. Plaintiff's emotional distress is so severe that no reasonable person could have been expected to endure it. Plaintiff was subjected to months of relentless, AirTag-facilitated stalking

during which the Stalker tracked her location continuously, followed her to her clients' homes, broke into her home on multiple occasions, hid inside her home, physically assaulted her multiple times resulting in hospitalizations, slashed her tires, broke her windows, and set fire to her $22,000 camper. Despite obtaining six protection orders and stalking charges resulting in seventeen pending criminal charges and six documented protection order violations, the stalking facilitated by Apple's AirTags continued unabated.

93. Plaintiff's emotional distress has been and continues to be medically diagnosable and significant, and will be established through the testimony of Plaintiff's treating physicians and mental health professionals at trial.

94. Plaintiff's damages — including the severe emotional and psychological harm described herein, as well as associated medical expenses, economic losses, and other damages — were a direct and proximate result of Apple's negligence, in amounts to be proven at trial.

95. Apple's conduct was willful, reckless, and undertaken with conscious disregard for the safety of consumers, including Plaintiff. Apple's knowing release and continued sale of a product that it knew was causing severe emotional and psychological harm to tens of thousands of victims constitutes aggravating circumstances that the jury should consider in awarding the full measure of Plaintiff's compensatory damages.

**COUNT V**

**INVASION OF PRIVACY — INTRUSION UPON SECLUSION**

**(Neb. Rev. Stat. § 20-203)**

96. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

97. Nebraska law provides that "[a]ny person, firm, or corporation that trespasses or intrudes upon any natural person in his or her place of solitude or seclusion, if the intrusion would be highly offensive to a reasonable person, shall be liable for invasion of privacy." Neb. Rev. Stat. § 20-203.

98. The Stalker intruded upon Plaintiff's solitude and seclusion through the covert placement of Apple AirTags in Plaintiff's home and on her vehicle, enabling the continuous, nonconsensual tracking of Plaintiff's real-time location, movements, and daily activities. The Stalker's intrusion was highly offensive to a reasonable person: the Stalker used the AirTag-facilitated surveillance to follow Plaintiff to her clients' homes, break into her residence on multiple occasions, conceal himself inside her home, physically assault her, and terrorize her and her family.

99. Apple knowingly provided the instrumentality through which the Stalker intruded upon Plaintiff's solitude and seclusion. As set forth below, Apple aided and abetted the Stalker's tortious invasion of Plaintiff's privacy by selling an inexpensive, easily concealable tracking device with no identity verification, no registration system, and anti-stalking safeguards Apple knew were inadequate, despite receiving over 40,000 stalking reports confirming that AirTags were being widely used for precisely this type of nonconsensual surveillance.

100. Apple's liability for invasion of privacy arises through its aiding and abetting of the Stalker's tortious conduct, as more fully set forth below. Under Nebraska law, civil aiding and abetting liability attaches to one who counsels, commands, directs, advises, assists, or aids and abets another individual in commission of a wrongful act or tort. The underlying tort — the Stalker's intrusion upon Plaintiff's seclusion in violation of Neb. Rev. Stat. § 20-203 — is established by the factual allegations set forth herein and incorporated by reference.

101. The intrusion upon Plaintiff's seclusion was highly offensive to a reasonable person. Plaintiff was subjected to months of covert surveillance that enabled the Stalker to monitor her every movement, follow her continuously, break into her home, physically assault her, destroy her property, and set fire to her alternate living quarters. No reasonable person would find such an intrusion anything other than highly offensive.

102. Plaintiff's damages — including the severe invasion of her privacy, the resulting physical, emotional, and psychological harm, property destruction, economic losses, lost business income, and other damages — were a direct and proximate result of the Stalker's intrusion upon her seclusion, which Apple aided and abetted, in amounts to be proven at trial.

103. Apple's conduct was willful, reckless, and undertaken with conscious disregard for Plaintiff's right to privacy and personal security. Apple's knowing provision of the instrumentality of the invasion — despite overwhelming evidence that AirTags were being used for exactly this type of nonconsensual surveillance — constitutes aggravating circumstances that the jury should consider in awarding the full measure of Plaintiff's compensatory damages.

**COUNT VI**

**CIVIL AIDING AND ABETTING**

**(NEBRASKA COMMON LAW)**

104. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

105. Civil aiding and abetting liability arises for "one who counsels, commands, directs, advises, assists, or aids and abets another individual in commission of a wrongful act or tort." *Bergman v. Anderson*, 226 Neb. 333, 338 (1987).

106. Civil aiding and abetting requires an underlying actionable tort. The underlying actionable torts here include the Stalker's tortious conduct constituting assault, battery, stalking, and invasion of privacy (intrusion upon seclusion under Neb. Rev. Stat. § 20-203), each of which is independently actionable under Nebraska law.

107. Apple provided knowing assistance to the Stalker's tortious conduct by designing, manufacturing, and selling the AirTag — an inexpensive, easily concealable, and extraordinarily effective tracking device — with the following characteristics that directly facilitated the Stalker's tortious conduct:

(a) No identity verification or account-linking requirement, allowing any person to purchase and deploy an AirTag anonymously and without accountability;

(b) No mandatory registration system linking each AirTag to a verified identity, preventing law enforcement from quickly identifying the person using the AirTag to stalk a victim;

(c) Anti-stalking safeguards that Apple knew were inadequate, including delayed alerts, the absence of automatic detection for Android users at launch, and an easily disabled speaker;

(d) A design that facilitated covert placement and continuous nonconsensual tracking, including the AirTag's small size, low cost, and reliance on a network of over two billion Apple devices to relay location data;

(e) The absence of any mechanism to prevent a single user from deploying multiple AirTags in proximity to a non-owner, or to prevent a stalker from continuously replacing AirTags once detected.

108. Apple's assistance was knowing. Apple knew that AirTags were being widely used as stalking tools. Apple received over 40,000 stalking reports during the three-year period

following the AirTag's release. Apple knew that the vast majority of law enforcement complaints it received concerning AirTags involved stalking — nearly twenty times as many as any other category of crime. Apple's CEO was personally briefed on press reports describing the AirTag as "a new means of inexpensive, effective stalking" within weeks of the product's release. Apple's own marketing materials acknowledged the risk of unwanted tracking and described the AirTag's anti-stalking features as designed to "deter as opposed to prevent" malicious use. Apple's internal data confirmed the scope of AirTag-facilitated stalking, while Apple publicly and deliberately mischaracterized stalking incidents as "rare."

109. Despite this knowledge, Apple continued to sell AirTags without implementing adequate safeguards, without requiring identity verification, without establishing a registration system, and without providing meaningful support to victims — including by routinely deleting pairing information associating stalkers with the AirTags they used, giving victims only weeks to seek that information before it was destroyed.

110. Apple's knowing assistance was a substantial factor in enabling the Stalker's tortious conduct against Plaintiff. Without the AirTag and its inadequate safeguards, the Stalker would not have had access to an inexpensive, easily concealable, and extraordinarily effective tool for continuous real-time location tracking. The Stalker's ability to track Plaintiff's movements, follow her to her clients' homes, break into her home, assault her, destroy her property, and terrorize her and her family was directly facilitated by Apple's product.

111. Apple's conduct constitutes civil aiding and abetting. Apple did more than merely sell a product that was later used for stalking — Apple sold a product it knew was being used to stalk tens of thousands of victims, with safeguards it knew were inadequate, while actively

concealing the scope of the problem from consumers and the public. Apple's conduct provided substantial assistance to the Stalker and to stalkers generally.

112. Plaintiff's damages — including physical, emotional, and psychological harm, property destruction, lost business income, economic losses, invasion of privacy, and other damages — were a direct and proximate result of the Stalker's tortious conduct, which Apple aided and abetted, in amounts to be proven at trial.

113. Apple's conduct was willful, reckless, and undertaken with conscious disregard for the safety of consumers, including Plaintiff. Apple's knowing facilitation of stalking, assault, battery, and invasion of privacy — through the continued sale of a product it knew was being used for those purposes, with safeguards it knew were inadequate — constitutes aggravating circumstances that the jury should consider in awarding the full measure of Plaintiff's compensatory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Apple Inc. and award the following relief:

a. Judgment in favor of Plaintiff and against Defendant on all counts set forth in this Complaint;

b. Compensatory damages in an amount to be proven at trial for physical, emotional, and psychological injuries, property destruction (including the loss of Plaintiff's $22,000 camper), economic losses, lost business income, and all other compensable damages;

c. Enhanced compensatory damages reflecting the aggravating nature of Defendant's conduct;

d. Injunctive relief requiring Apple to implement adequate anti-stalking safeguards sufficient to protect consumers and the public from covert, nonconsensual location tracking, including but not limited to the feasible alternative designs described herein;

e. Reasonable attorney fees and costs of suit;

f. Pre-judgment and post-judgment interest as allowed by law;

g. Costs of suit; and

h. Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims and issues so triable as a matter of right under the Seventh Amendment to the United States Constitution and Fed. R. Civ. P. 38.

Dated: September 16, 2026

Respectfully submitted,

Patrick Lannen

Patrick C. Lannen, Esq. (P73031)
STINAR LANNEN, PLLC
280 W. Maple Rd., Ste. 200
Birmingham, MI 48009
Telephone: (248) 565-2690
Email: Patrick@StinarLannenLaw.com
*Attorney for Plaintiff Jane JJ Doe*